IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARK N. MOSKOWITZ and IGBS CORPORATION, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 21 C 5338 ) ) Magistrate Judge Gabriel A. Fuentes |
| ALLIANT INSURANCE SERVICES, INC., | ) ) ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

On November 18 and 19, 2024, this Court conducted a bench trial in which Plaintiffs, Mark N. Moskowitz ("Moskowitz") and IGBS Corporation ("IGBS") (collectively, "Plaintiffs"), sought to prove that Defendant, Alliant Insurance Services ("Alliant"), an employee benefits consulting and brokerage firm, was liable for damages for breach and an accounting of the independent contractor agreement ("ICA") that Moskowitz entered into with EBCG, LLC ("EBCG"), a brokerage firm, in 2017, regarding commissions earned from certain business conducted with pharmaceutical company Novartis.[1] Plaintiffs' action sought damages based on commissions earned by American Benefits Consulting, LLC ("ABC"), a brokerage firm acquired by Alliant in 2015, from certain Novartis business between December 31, 2020 (the date EBCG sold its assets to Alliant) and September 30, 2021 (the date the ICA terminated). Pursuant to the Court's order (D.E. 119), on January 27, 2025, the parties each filed proposed findings of fact and conclusions of law. (*See* D.E. 121: Pl. Proposed Findings of Fact and Conclusions of Law ("Pl. Findings"); and

---

[1] This case was referred to this Court for discovery supervision in October 2021, shortly after it was filed (D.E. 7), and on April 18, 2024, at the end of discovery and dispositive motion practice in the district court, the case was reassigned to this Court for all further proceedings upon the joint consent of the parties (D.E. 79), *i.e.*, the trial. (D.E. 80.)

D.E. 122: Def. Proposed Findings of Fact and Conclusions of Law ("Def. Findings").) The Court has reviewed the parties' proposed findings, the trial transcript, and trial exhibits, and this decision sets forth the Court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT[2]

In 2007, Moskowitz joined ABC and obtained a broker of record ("BOR") letter from Novartis designating ABC as Novartis's BOR for the following insurance coverages: group long-term care; group property and casualty; group auto and home; life insurance; disability; dental; identity theft; and group legal. (Pl. Findings ¶ 12; Def. Findings ¶ 7.) Based on the BOR letter, insurance companies that sold Novartis the insurance products specified would pay commissions to ABC, the designated brokerage firm. (Pl. Findings ¶ 13; Def. Findings ¶ 5.)

In February 2014, Moskowitz left ABC to join EBCG, which Dan Papajcik ("Papajcik") had formed in 2013. Moskowitz obtained a new BOR letter from Novartis identifying EBCG as the BOR for the following insurance coverages: life insurance, disability, dental, accident, group legal, and identity theft. (Pl. Findings ¶ 15; Def. Findings ¶ 8.) Moskowitz was the relationship and account manager for these coverages, and these coverages stayed with EBCG until September 30, 2021. (Pl. Findings ¶ 15; Def. Findings ¶¶ 9-10; D.E. 117: Trial Tr. 438:10-18.)

ABC has retained its designation as Novartis's BOR for the auto and home and long-term care coverages since 2014; ABC also is Novartis's BOR for pet insurance coverage. (Pl. Findings ¶¶ 15, 47; Def. Findings ¶¶ 9-10.) Moskowitz is neither the relationship nor account manager for Novartis on these ABC accounts. (Trial Tr. 438:20-22.) In 2015, ABC was acquired by Alliant; ABC maintains its own headquarters in New York and operates separately from Alliant. (Pl.

---

[2] The parties do not dispute these facts, which were presented at trial.

Findings ¶ 46; Def. Findings ¶ 41.) ABC also maintains its own bank account separate from Alliant, and ABC is paid directly for commissions—including those related to the coverages for which ABC is Novartis's BOR—that it earns from insurance carriers. (*Id*.) ABC employees perform the day-to-day administrative and consulting work for ABC clients, including the Novartis accounts for which ABC is the BOR. (*Id*.; *see also* Trial Tr. 433:4-17.) Since leaving ABC, neither Moskowitz nor EBCG has ever received any revenue or commissions tied to the Novartis coverages for which ABC maintained the BOR designation. (Trial Tr. 431:11-22.)

In 2017, Moskowitz left EBCG and entered into the ICA with EBCG. Under the ICA, EBCG (identified as "Corporation" in the ICA) agreed that "[w]ith respect to the Novartis Fees paid to and received by Corporation for any and all services provided to service the Novartis Account during each twelve (12) month period" the ICA was in effect (October 1, 2017 through September 30, 2021), EBCG would pay Moskowitz (identified as "Contractor" in the ICA) 50 percent of the gross Novartis Fees up to $600,000 received and 100 percent of the gross Novartis Fees EBCG received in excess of $600,000. (D.E. 114-1: Pl. Trial Ex. 1 ("ICA") ¶ 8.) EBCG also agreed that when it "receives payment of any Novartis Fees, Corporation shall: (a) provide written notice of such receipt to Contractor along with any carrier/provider written statements received by Corporation . . ." (*Id*. ¶ 9.) The ICA defines "Novartis Fees" as "any and all fees paid by Novartis and/or any insurance company and/or other service providers in connection with any and all services provided to service the Novartis account" and collected by EBCG. (*Id*. ¶ 7.) The "Novartis Account" and the "services provided to service the Novartis Account" are not precisely defined in the ICA, but they are referred to and described throughout the ICA as follows:

- "WHEREAS, now and at all times relevant to this Agreement, [Novartis] [is] a client of Corporation; Corporation is the Broker of Record for Novartis; and Contractor, prior to and during his employment by Corporation before the Effective Date, has been the

3

relationship manager and account manager for Novartis." (*Id.*, Recital No. 4 ("incorporated as integral terms" of the ICA).)

- "The services described in this Agreement to be performed by Contractor shall be deemed to have commenced on October 1, 2017." (ICA ¶ 2.)

- "The Novartis account shall be administered by Contractor on behalf of Corporation for all purposes, including: a. Corporation shall continue to be designated for all purposes as the Broker of Record for Novartis, including carrier changes; and b. Corporation shall receive payment from Novartis of all fees or other revenues." (*Id.* ¶ 3.)

- "Contractor shall perform any and all administration and consulting services required to service the Novartis account on behalf of Corporation pursuant to the terms of this Agreement." (*Id.* ¶ 4.)

- "Contractor may create and maintain an entity to carry out his obligations under this Agreement, but only so long as Contractor remains personally obligated to provide the personal services necessary to service the Novartis account. In such event, both Contractor and such entity shall be jointly and severally liable to fulfill Contractor's obligations as provided under the terms of this Agreement. It is the express intent of the parties that the services to be provided to service the Novartis account on behalf of Corporation are personal in nature and are to be performed by Contractor. (*Id.* ¶ 5.)

- "Contractor shall be solely responsible for the payment of any and all expenses, direct and indirect, relating to the Novartis account, and Corporation shall have no liability for the payment of any such expenses," but "Corporation shall be solely responsible for any expenses Corporation may directly incur for its employees to travel to and attend any meetings relating to the Novartis account and/or that Corporation may otherwise directly incur to perform its obligations pursuant to this Agreement." (*Id.* ¶¶ 10-11.)

- "Contractor shall take any and all reasonable steps to ensure that: a. Corporation remains the Broker of Record for Novartis, including any carrier changes, during the Term of the Independent Contractor Agreement; and b. Corporation remains qualified to receive any supplemental compensation due in connection with the Novartis account." (*Id.* ¶ 14.)

Moskowitz was assisted by counsel in negotiating the ICA, but he played an active role in the negotiations, and he reviewed the ICA with his attorney carefully before signing. (Def. Findings ¶¶ 16-17; *see also* Trial Tr. 198:20-24, 436:9-17.) Moskowitz understood that the ICA pertained to accounts where EBCG was the BOR for Novartis, and these were accounts for which he had been providing services as relationship and account manager while employed at EBCG. (Def. Findings ¶¶ 17-18; *see also* Trial Tr. 438:10-18.) Moskowitz "has always known," that ABC

4

continued to received commissions for its work for Novartis based on ABC's designation as Novartis's BOR for the auto/home, long-term care, and pet insurance coverages. (Trial Tr. 195:11-196:1.) Moskowitz understood that under the ICA, he was to continue to service the accounts where EBCG was the BOR for Novartis, and to ensure that EBCG kept the BOR letter on those accounts, as he had done while he was employed at EBCG. (*Id*. 438:10-18.)

Papajcik was responsible for providing Moskowitz with EBCG's commission reports for the accounts where EBCG was the BOR for Novartis, pursuant to paragraph 9 of the ICA. (Pl. Findings, ¶ 32; Def. Findings ¶¶ 35-36.) While the ICA was in effect, Plaintiffs received reports on all Novartis business for which EBCG was the BOR, and they were paid all fees they were owed for this business under the terms of the ICA; after EBCG received monies and commissions on this business, EBCG would send a fee payment to the IGBS bank account with a copy of the commission statements. (Pl. Findings, ¶ 32; Def. Findings ¶¶ 35-37; Trial Tr. 190:1-191:14.) Shortly after he left EBCG, Moskowitz formed IGBS with Janice Gannon ("Gannon") in 2017. (Trial Tr. 89:9-12.)

On December 31, 2020, EBCG sold its assets to Alliant, including EBCG's bank account and EBCG's obligations under the ICA. (Pl. Findings ¶¶ 21-22; Def. Findings ¶ 33.) After the sale, EBCG continued to be designated the BOR regarding the coverages for which Novartis had designated EBCG, although Alliant was effectively the BOR, as commissions from this business were paid to the EBCG bank account, which was now owned by Alliant. (Pl. Findings ¶¶ 6, 30; Def. Findings ¶ 34.) Papajcik informed Plaintiffs that the acquisition occurred; he became First Vice President of Alliant and was responsible for providing Plaintiffs with EBCG's commission reports for the accounts where EBCG was the BOR for Novartis. (Pl. Findings ¶ 7; Def. Findings ¶ 35; D.E. 113: Def. Trial Ex. 12 (1/11/21 email from Papajcik to Moskowitz and Gannon).) After

EBCG was acquired by Alliant and while the ICA was still in effect, Papajcik provided monthly commission reports and paid all the fees Plaintiffs were owed for the Novartis business for which EBCG was BOR. (Pl. Findings ¶¶ 31-32.)[3]

From January through July 2021, Alliant did not send commission reports or pay any fees to Moskowitz based on commissions that ABC earned from Novartis business for which ABC was BOR, meaning ABC was the producer who brought in the business and commissions were paid directly into ABC's bank account. (*Id*. ¶ 33.) On August 3, 2021, Papajcik emailed Moskowitz and Gannon a report showing commissions paid to ABC from MetLife for Novartis business in July 2021. (*Id*. ¶ 40.) Alliant initially paid IGBS commissions on this business but later retracted those payments. (*Id*.)

In the first months after Alliant acquired EBCG, Moskowitz and Gannon "really weren't thinking about" the fact that Alliant owned ABC. (Trial Tr. 466:12-14.) But later in 2021, they had an "aha" moment when they realized that they were not seeing commission reports on ABC-generated Novartis business. (*Id*. 466:19.) Moskowitz and Gannon testified that they came to believe that, despite ABC being the BOR and producer of the Novartis business for which it was paid commissions, they were entitled to ABC's commissions based on its acquisition by Alliant in 2015, because paragraph 8 of the ICA said Moskowitz was entitled to "*any and all* fees." (*Id*. 127:2-7, 128:4-6, 195:11-196:14, 465:25-466:21 (emphasis added).) Based on the ICA, they testified, they believed they were entitled to 100 percent of the commissions ABC received on Novartis-related coverages between January 1, 2021, when Alliant acquired EBCG, and

---

[3] Gannon testified that beginning in March 2021, Papajcik sent monthly commission statements in the form of spreadsheets rather than photocopies, as he had previously done. Gannon thought that the spreadsheets were less reliable than photocopies (Trial Tr. 56:7-24), but Plaintiffs admit that Alliant paid them all the monies they were due on EBCG Novartis business under the ICA.

6

September 30, 2021, when the ICA terminated. (*Id*. 145:23-24, 151:12-15, 463:15-464:2.) On October 1, 2021, Novartis rescinded its appointment of EBCG as BOR for any insurance products, and appointed IGBS as BOR for Novartis's group life, disability, dental, and group legal insurance coverages. (*Id*. 418:6-419:22, 424:20-425:9; *see also* Def. Trial Ex. 14 (10/1/21 BOR letter).) IGBS's BOR letter from Novartis did not include any coverages for which ABC was the BOR. (Trial Tr. 420:19-22.)

## CONCLUSIONS OF LAW

The parties (and the Court) agree that the ICA is a valid and enforceable contract entered into between Moskowitz and EBCG and governed by Illinois law, and that Alliant assumed EBCG's obligations under the ICA when it purchased EBCG's assets.[4] (Pl. Findings ¶¶ 58-59, 61; Def. Findings ¶ 11.) Plaintiffs' claim for breach focuses on Paragraphs 7 and 8 of the ICA, which, they contend, show they are entitled to "any fees or commissions Alliant collects through its subsidiaries, such as ABC," without regard to whether Plaintiffs "affirmatively manage specific Novartis accounts." (Pl. Findings ¶ 63.) Defendant counters that reading the ICA as a whole shows that Moskowitz was only entitled to fees based on commissions EBCG, and later Alliant, earned based on EBCG's BOR letter from Novartis, and for which insurance products Moskowitz personally serviced as the relationship and account manager. (Def. Findings at 16-17.)

---

[4] The fact that the ICA is a valid and enforceable contract dooms Count II of Plaintiffs' complaint seeking an accounting under Illinois law, which is an equitable remedy that calls for "a statement of receipts and disbursements to and from a particular source." *Devyn Corp. v. City of Bloomington*, 2015 IL App (4th) 140819, ¶ 71, 38 N.E.3d 1266, 1278 (2015). As an equitable remedy, it is unavailable when there is an adequate remedy at law, *i.e.*, Plaintiffs' claim for breach of the ICA. *See Chicago Architectural Metals, Inc. v. Bush Constr. Co., Inc.*, 2022 IL App (1st) 200587, ¶ 61, 201 N.E.3d 148, 160 (2022) ("To obtain an equitable accounting, the plaintiff must show the absence of an adequate remedy at law and one of the following: (1) a breach of a fiduciary relationship between the parties; (2) a need for discovery; (3) fraud; or (4) the existence of mutual accounts which are of a complex nature."). Illinois courts have "recognized an exception in cases in which an accounting is sought based on a breach of a fiduciary duty," *People ex rel. Hartigan v. Candy Club*, 149 Ill. App. 3d 498, 501, 501 N.E.2d 188, 190 (1986), but that is not the case here. Accordingly, the Court finds against Plaintiffs and in favor of Defendant on Count II of Plaintiffs' complaint, and the Court will not order an accounting.

Defendant's reading of the ICA is supported by Illinois contract law; Plaintiffs' is not. Under Illinois law:

> the primary objective is to determine and give effect to the intent of the parties at the time they entered into the contract. The first place a court looks to determine the parties' intent is the language of the contract, considering the whole contract, not just a provision in isolation. In the absence of an ambiguity, the intention of the parties at the time the contract was entered into must be ascertained by the language utilized in the contract itself, not by the construction placed upon it by the parties.

*Clanton v. Oakbrook Healthcare Ctr., Ltd.*, 2023 IL 129067, ¶ 30, 226 N.E.3d 1266, 1274 (2023) (internal citations omitted). "Moreover, because words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others. The intent of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself." *Vill. of Kirkland v. Kirkland Props. Holdings Co., LLC I*, 2023 IL 128612, ¶ 63, 221 N.E.3d 300, 316 (2023) (internal citations and quotations omitted).

Plaintiffs' argument that they are entitled to "any and all fees" from all Novartis business under the Alliant umbrella isolates a few words from paragraphs 7 and 8 of the ICA ("any and all") and attempts to use them to rewrite the entire agreement. But reading the ICA as a whole, as well as the full text of paragraphs 7 and 8, the Court finds the parties never intended for Moskowitz to be paid for any business other than that for which EBCG was Novartis's BOR and Moskowitz had been the relationship and account manager while he was employed at EBCG, and for which, during the term of the ICA, Moskowitz would personally continue to perform the administrative and consulting services required. (*See* ICA ¶¶ 2-5, Recital No. 4.)

More specifically, Paragraph 7 states that EBCG "shall continue to collect and be entitled to receive any and all fees paid by Novartis and/or any insurance company and/or other service providers in connection with any and all services provided to service the Novartis Account (the 'Novartis Fees')." (ICA ¶ 7.) Read in conjunction with Recital No. 4 and paragraphs 3 through 5

8

of the ICA, the Court finds that "the Novartis Account" can only be understood to be the Novartis business for which EBCG was the BOR and for which Moskowitz personally provided services, such that the Novartis Fees as defined in the ICA could only encompass fees paid on this particular business. Paragraph 8 of the ICA, which specifies the percentage of Novartis Fees that "the Corporation" (EBCG and then Alliant) must pay Moskowitz "for any and all services provided to service the Novartis Account" during the term of the ICA (*id*. ¶ 8), includes only the Novartis business for which EBCG was the BOR and for which Moskowitz personally provided services. Likewise, paragraph 9, in which the Corporation agrees to provide monthly written notice of Novartis Fees the Corporation received, can only refer to the fees that EBCG, and later Alliant, received for Novartis business for which EBCG was the BOR and for which Moskowitz personally provided services. (*Id*. ¶ 9.) Therefore, the ICA does not entitle Plaintiffs to any part of the commissions from ABC's Novartis business.

Although the Court's interpretation of the unambiguous terms of the ICA is outcome-determinative in this case, Moskowitz's testimony at trial cut against his interpretation of the contract, even if the Court had found it ambiguous. Further confirming that the ICA was intended only to apply to accounts for which EBCG was the BOR for Novartis, and for which Moskowitz provided services to Novartis as the relationship and account manager, Moskowitz testified as follows in response to questions posed by Defendant's counsel:

> Q. Mr. Moskowitz, you understood before signing the independent contractor agreement that the agreement pertained to the client Novartis where EBCG was the broker of record for Novartis, correct?
>
> A. Yes.
>
> Q. When you signed that agreement, you understood that this agreement pertained to Novartis accounts where EBCG -- I'm sorry -- where you were the relationship manager and the account manager for Novartis, right?

9

> A. Yes.
>
> Q. You were the one responsible, as you understood under the terms of that independent contractor agreement, to provide any and all, any and all administration and consulting services yourself, right?
>
> A. That I was to be involved in any and all, not that every single bit of service would be performed by me per se.
>
> Q. You were neither the relationship nor account manager for Novartis on the ABC accounts, were you?
>
> A. No.

(*Id*. 438:10-22, 440:20-25.) On redirect examination by his own counsel, Moskowitz confirmed that this was indeed his understanding:

> Q. Isn't it a fact that at the time you negotiated and signed the independent contractor agreement, that was prior to Alliant's acquisition of the EBCG assets, correct?
>
> A. Correct.
>
> Q. So at that time the issue of any purported or supposed or fictitious assignment to ABC would not have been an issue in your mind, would it?
>
> A. No, it wouldn't.
>
> Q. All right. It's not something that had happened so, therefore, you didn't really give it consideration, did you?
>
> A. Correct.

(*Id.* 465:14-24.) Papajcik, who helped negotiate the ICA on behalf of EBCG, testified that at the time of signing, he, too, understood it to pertain only to accounts for which EBCG was the BOR for Novartis, and which Moskowitz personally serviced. (*Id*. 258:11-259:21.) Furthermore, Moskowitz testified that he knew when he signed the ICA, and had "always known," that ABC was receiving commissions for its work for Novartis based on ABC's designation as Novartis's BOR for the auto/home, long-term care, and pet insurance coverages. (*Id*. 195:11-196:1.)

Moskowitz's belief that the ICA also entitled him to ABC's commissions on Novartis business for which ABC was the BOR did not form until later in 2021, after Alliant purchased EBCG. Moskowitz testified as follows in response to his counsel's questions:

> Q. Okay. And is it your understanding as you sit here today that upon acquisition of the independent contractor agreement that Alliant -- and I'll use Mr. Papajcik's phrase -- that Alliant stepped into the shoes of EBCG?
>
> A. Yes.
>
> Q. And so at that point, once Alliant had stepped into the shoes of EBCG, commission payments to its wholly owned subsidiary ABC became an issue to you, is that correct?
>
> A. Not immediately but –
>
> Q. Eventually?
>
> A. Yes.
>
> Q. Okay. And when you say "not immediately," why is that?
>
> A. The first month or two, things continued as they had. We really weren't thinking about it. There was a -- there was a -- we were told that Alliant would be assuming payment of the fees to us, and there were some issues that Mr. Papajcik was having in getting documents. Jan and I just came up with the idea, well, let's just buy out the rest of our obligation. Dan said no, and we started looking at it a little differently. Then we went, aha, according to everything we could see publicly Alliant owned ABC, and thus we embarked on our path that led us here today.

(*Id*. 465:25-466:21.) Moreover, in response to his counsel's questions as to how "the relationship and the reporting under the [ICA] change[d]" after Alliant purchased EBCG, Moskowitz testified:

> But I guess the click didn't happen about common -- my perception, common ownership that Alliant was the company that's referenced here. And, in fact, since they owed us all their commissions -- or under the terms of paragraph 8, I believe, it didn't click until sometime that year when we were trying to work out the issues with the Alliant payment.

(*Id*. 195:23-196:6.) The Court's interpretation of the unambiguous contract as a whole defeats Plaintiffs on the law in this case, and the foregoing testimony confirms the Court's interpretation.

11

Thus, the Court finds that "the intent of the parties at the time they entered into the [ICA], . . . considering the whole contract, not just a provision in isolation," *Clanton*, 2023 IL 129067, ¶ 30, 226 N.E.3d at 1274, was to agree that Moskowitz would be paid fees from commissions earned based on accounts where (1) EBCG was the BOR for Novartis, and (2) Moskowitz serviced those accounts. Moskowitz knew, at the time he signed the ICA, that ABC was receiving commissions for work ABC's employees performed for Novartis based on separate insurance coverages included within ABC's BOR designation with Novartis, including auto/home, long-term care, and pet insurance coverages. The language of the ICA does not provide Moskowitz with a basis to believe that he was entitled to any fees from those ABC commissions.

Instead, Moskowitz and Gannon concluded years later that they should get ABC's commissions on business for which they performed zero work simply by virtue of EBCG having sold all its assets to Alliant on December 31, 2020. (Trial Tr. 59:24-60:3, 126:12-127:9, 465:25-466:21.) Plaintiffs' contorted reading of the ICA in this manner creates an absurd result, and "Illinois recognizes the maxim that a contract will not be interpreted literally if doing so would produce absurd results, in the sense of results that the parties, presumed to be rational persons pursuing rational ends, are very unlikely to have agreed to seek." *Full Circle Villagebrook GP, LLC v. Protech 2004-D, LLC*, 119 F.4th 522, 526 (7th Cir. 2024) (internal citations and quotations omitted). Plaintiffs' interpretation of the ICA as entitling them to any fees or commissions from any Novartis business conducted under Alliant's large umbrella would produce a result that the contracting parties were highly unlikely to have agreed to seek. As for EBCG, when it signed the ICA, EBCG could not validly agree to pay Moskowitz any fees or commissions on Novartis business for which EBCG was not the BOR. And the "court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and

12


obvious meaning of the language used." *Romspen Mortg. Ltd. P'ship v. BGC Holdings LLC - Arlington Place One*, 20 F.4th 359, 371 (7th Cir. 2021), quoting *Thompson v. Gordon*, 241 Ill. 2d 428, 442, 948 N.E.2d 39, 47 (2011). As for Plaintiffs, Moskowitz admitted at trial that he came to his current interpretation of the ICA years after signing it, and after the December 2020 Alliant acquisition of the EBCG assets. (Trial Tr. 465:25-466:21.)

When Alliant purchased EBCG's assets and the ICA transferred to Alliant, Alliant continued to be subject only to the terms to which EBCG agreed, and those terms did not include commissions on any insurance products for which ABC was designated the BOR. Whether or not Plaintiffs are correct that "all the commissions paid to ABC travel upstream to Alliant," as the parent company since 2015 (Pl. Findings ¶ 46), does not alter the terms of the contract signed by EBCG and Moskowitz in 2017.[5] The terms of the ICA do not permit Plaintiffs to receive any part of the commissions that ABC earned based on work it performed pursuant to its BOR with Novartis.

---

[5] To the extent Plaintiffs are arguing that the Court should treat Alliant and ABC as the same entity, the Court declines to do so as Plaintiffs have presented no evidence in support of this claim. The Court notes that "even where one corporation wholly owns another and the two have mutual dealings," they are treated as separate and distinct legal entities unless the evidence shows that the "subsidiary is so organized and controlled, and its affairs so conducted by a parent, that observance of the fiction of separate identities would sanction a fraud or promote injustice." *In re Rehab. of Centaur Ins. Co.*, 158 Ill. 2d 166, 173, 632 N.E.2d 1015, 1017 (1994). "In addition, the use of common officers and directors does not render one corporation liable for the obligations of another. These practices are common and exist in most parent-subsidiary relationships." *Gass v. Anna Hosp. Corp.*, 392 Ill. App. 3d 179, 185, 911 N.E.2d 1084, 1090 (2009) (internal citations omitted).

## CONCLUSION

For the foregoing reasons, the Court enters judgment in favor of Defendant and against Plaintiffs on both counts: Count I for breach of contract and Count II for accounting.

**SO ORDERED.**

<div style="text-align: right;">

ENTER:

_____
**GABRIEL A. FUENTES**
**United States Magistrate Judge**

</div>

**DATED: March 4, 2025**